

**U.S. Department of Justice**

*United States Attorney*
*District of New Jersey*

_____

*Meredith Williams*          *970 Broad Street, Suite 700*
*Assistant United States Attorney*   *Newark, New Jersey 07102*

*Direct Dial: (973) 297-2013*

June 7, 2021

**VIA ECF & E-MAIL**

The Honorable Brian R. Martinotti, U.S.D.J.
U.S. District Court for the District of New Jersey
Clarkson F. Fisher Building & U.S. Courthouse
402 East State Street
Trenton, New Jersey 08608

      RE:   *United States v. Siddeeq Williams*, Crim. No. 17-484

Dear Judge Martinotti:

The Government submits this opposition to defendant Siddeeq Williams' ("Williams" or "Defendant") motion for compassionate release. Williams first filed his motion for compassionate release on December 23, 2020 (ECF No. 34), and filed supplemental letters on January 2, 2021 (ECF No. 35), January 7, 2021 (ECF No. 36), January 30, 2021 (ECF No. 39), February 5, 2021 (ECF No. 40), February 25, 2021 (ECF No. 41), March 5, 2021 (ECF No. 42), and April 5, 2021 (ECF No. 43) (collectively the "Motion"). The matter was referred for review by the Federal Public Defender's Office, and on or about May 25, 2021, the Public Defender's Office declined to represent Williams.

In his various submissions, Williams asks the Court to reduce his 121 month sentence to time served or home confinement based on: (1) the conditions at Fort Dix Federal Correction Institute ("Fort Dix FCI"), which during the pandemic has had a relatively high incidence of COVID-19 infections; (2) myriad of health issues including, obesity, hyperlipidemia, bronchitis, low blood pressure, history of smoking marijuana, chronic knee pain, and an ear infection; (3) his concerns of contracting a severe form of COVID-19, (4) his concerns of being re-infected after testing positive for COVID-19 in October 2020; and (5) his family circumstances. Based on these reasons, Williams contends that there are extraordinary and compelling reasons warranting compassionate release.

Although the Government emphasizes and understands Williams concerns regarding COVID-19, Williams' request for a reduction in his term of imprisonment to time-served or home confinement should be denied because he has failed to establish extraordinary and compelling reasons to justify relief, even though his obesity places him at a higher risk of contracting COVID-19. Further, as detailed herein, based on an individualized analysis of the § 3553(a) factors, release is unwarranted.  Williams was infected with COVID-19 and has recovered.  Moreover, Williams was offered the COVID-19 vaccine on two occasions - in December 2020 and on March 8, 2021, and he refused it both times. (Gov't Ex. A, at 92 & 118).   Third, although Fort Dix FCI has had a relatively high number of positive COVID-19 cases since the pandemic began, the facility currently has no COVID-19 cases.  Finally, the § 3553(a) factors favor Williams completing his sentence because he was part of a drug conspiracy that involved 141 kilograms of cocaine and heroin, and when law enforcement tried to apprehended him, he drove his car into a law enforcement car that contained two officers, and then fled from law enforcement by driving at dangerous rates of speed.  His involvement in a very significant drug trafficking conspiracy and his reckless conduct put innocent bystanders in danger.  These actions render completion of his punishment—and thus protection of the public and general and specific deterrence—paramount.

## I.    BACKGROUND

### A.    Williams' Conviction and Sentencing

During an investigation, law enforcement learned that Williams was involved in a conspiracy in which he and other conspirators obtained controlled substances via tractor trailers that would travel from California to New Jersey to meet with Williams and his conspirators.   On or about August 27, 2017, one such tractor trailer (the "Tractor Trailer") arrived in the District of New Jersey.  Thereafter, law enforcement conducted a vehicle stop of the Tractor Trailer after the driver committed several traffic violations.   At the time of the stop, law enforcement conducted a lawful search of the Tractor Trailer and recovered approximately five (5) large duffle bags that in total contained approximately 141 packages, which in total was 141 kilograms of heroin and cocaine.

On or about August 30, 2017, law enforcement went to speak with Williams and another conspirator.  After law enforcement observed Williams operating a Black Honda Pilot (the "Pilot"), a federal Task Force Officer with the DEA ("Victim One"), who was operating an undercover law enforcement vehicle, initiated his lights in order to pull over Williams.  A DEA Special Agent ("Victim Two") was seated in the front passenger seat of Victim One's vehicle.  Shortly after Victim One and Victim Two attempted to pull over Williams, Williams sped away in a reckless manner.

As a result, Victim One and Victim Two, in the undercover law enforcement vehicle with lights and sirens on, pursued Williams. They also alerted nearby law enforcement officers of Williams' flight, at which time Williams, who was operating the Pilot against traffic, attempted to drive directly into a second law enforcement vehicle. The vehicle that Williams attempted to hit was occupied by another DEA Task Force Officer, who successfully turned his vehicle out of the Pilot's path.

Within seconds of this, Williams looked directly at Victim One and Victim Two and drove directly into the side of Victim One's vehicle. As a result, Williams rammed Victim One's vehicle, pushed it off the road, and fled the area. Over a day later, Williams turned himself into law enforcement.

On November 8, 2017, Williams pled guilty to a two-count Information. Count One charged him conspiring to distribute, and possess with the intent to distribute, 1 kilogram or more of a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance, and five kilograms or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance, contrary to Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A); and in violation of Title 21, United States Code Section 846. Count Two charged him with forcibly assaulting Victim One and Victim Two, people designated in Title 18, United States Code, Section 114, namely a Task Force Officer assigned to the United States Drug Enforcement Administration ("DEA") and a Special Agent with the DEA, while they were engaged in their official duties, and in doing so, with the intent to commit another felony, did use a deadly or dangerous weapon, namely a motor vehicle, in violation of Title 18, United States Code, Sections 11(a)(1) and (b).

On or about September 12, 2018, this Court sentenced Williams to 121 months' imprisonment to be followed by five years of supervised release. ECF No. 30. Williams has been in continuous federal custody since he was arrested. He is currently incarcerated at Fort Dix FCI in New Jersey. Williams' estimated release date, assuming good-time credit, is in or around June 2026.

### B.     BOP's Response to the COVID-19 Pandemic

COVID-19 is a dangerous illness that has caused many deaths in the United States over the past 16 months and that has resulted in massive disruption to our society and economy. In response to the pandemic, BOP has taken significant measures to protect the health of inmates. BOP is "carefully monitoring the spread of the COVID-19 virus," and "carefully assess[ing] how to best ensure the safety of staff, inmates and the public."[1]

---

[1] *COVID-19*, BOP, *available at* https://www.bop.gov/coronavirus.

1.   *BOP's COVID-19 Protocols and Procedures*

BOP has had a Pandemic Influenza Plan in place since 2012.[2]  That detailed protocol established a multi-phase framework that required BOP facilities to begin preparations on learning of a suspected outbreak and addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.  Consistent with that plan, BOP began readying for potential coronavirus transmissions in January 2020.  It established a working group to develop policies in consultation with subject matter experts in the Centers for Disease Control, including by reviewing guidance from the World Health Organization.

On March 13, 2020, BOP began to modify its operations, in accordance with its Coronavirus (COVID-19) Action Plan ("Action Plan"), to minimize the risk of COVID-19 transmission into and inside its facilities.  Since that time, BOP has repeatedly revised the Action Plan to address the crisis.[3]

BOP's operations are presently governed by Phase Nine of the Action Plan. The current modified operations plan requires that all inmates in every BOP institution be secured in their assigned cells/quarters, in order to stop any spread of the disease. Only limited group gathering is afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has severely limited the movement of inmates and detainees among its facilities. Though there will be exceptions for medical treatment and similar exigencies, this step as well will limit transmissions of the disease. Likewise, all official staff travel has been cancelled, as has most staff training.

All staff and inmates have been and will continue to be issued face masks and strongly encouraged to wear an appropriate face covering when in public areas when social distancing cannot be achieved.

The BOP tests all inmates upon arrival at a BOP detention center/jail unit or at one of the three quarantine sites.[4]  All inmates are tested again

---

[2] *See Pandemic Influenza Plan-Module 1: Surveillance and Infection Control*, BOP Health Services Division, (Oct. 2012), *available at* https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf.

[3] *See BOP Implementing Modified Operations Plan*, BOP, *available at* https://www.bop.gov/coronavirus/covid19_status.jsp.

[4] *See supra* note 3.

before movement to their designated BOP facility.  Every newly admitted BOP inmate is screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting Centers for Disease Control and Prevention ("CDC") criteria for release from isolation.  In addition, all staff are screened for symptoms.  Such screening includes self-reporting and temperature checks.

### 2.   *BOP's Home Confinement Initiatives*

To relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is exercising greater authority to designate inmates for home confinement.  On March 26, 2020, the Attorney General directed the Director of the BOP, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement.  That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, *see* 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g).  Congress has also acted to enhance BOP's flexibility to respond to the pandemic.  Under the Coronavirus Aid, Relief, and Economic Security Act, enacted on March 27, 2020, BOP may "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" if the Attorney General finds that emergency conditions will materially affect the functioning of BOP. Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note).  On April 3, 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion, beginning at the facilities that thus far have seen the greatest incidence of coronavirus transmission.

The BOP has considered many prisoners for home confinement following the above memoranda.  In order to make its decision, the BOP analyzes, among other factors, the inmate's age and vulnerability, conduct, and Prisoner Assessment Tool Targeting Estimated Risk and Need ("PATTERN") score.[5]

---

[5] PATTERN is a U.S. Department of Justice's risk and needs assessment tool, which was instituted in compliance with the First Step Act.  *FSA Update* (Jan. 15, 2020), BOP, *available at* https://www.bop.gov/resources/news/20200115_fsa_update.jsp.  It is designed to measure inmates' risk of recidivism through a fifteen-factor assessment that includes various elements of inmates' actions while in prison, criminal history, age at the time of assessment, and the instant offense.  *The First Step Act of 2018: Risk and Needs Assessment System – UPDATE January 2020*, U.S. Department of Justice, Office of the Attorney General, at 10-11, *available at*

Further, BOP "has generally prioritized" inmates who "either (1) have served 50% or more of their sentence, or (2) have 18 months or less remaining in their sentences and have served 25% or more of their sentences." BOP's implementation of the Memoranda has resulted in a significant increase in the transfer of inmates to home confinement. As of June 2, 2021, BOP has transferred approximately 26,162 inmates to home confinement. *See COVID-19 Home Confinement Information*, BOP, *available at* https://www.bop.gov/coronavirus/ (last accessed on June 2, 2021).

Taken together, these measures are designed to mitigate sharply the risks of COVID-19 transmission in a BOP institution. BOP has pledged to continue monitoring the pandemic and to adjust its practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

In addition to the proactive safety measures the BOP has undertaken, outlined above, the United States has made great advancement in the development, authorization, and distribution of effective vaccines to combat the transmission of COVID-19. To date, several vaccines have been approved for distribution, and distribution efforts are ongoing. On December 30, 2020, the BOP released the following statement regarding their efforts concerning the administration of vaccines:

> BOP advises that it is working with the Centers for Disease Control and Prevention (CDC) and a public-private partnership established by the federal government, known as Operation Warp Speed (OWS), to ensure the BOP receives the COVID-19 vaccine as it becomes available....At present, as vaccines are obtained, priority is given to full-time staff members, in order to mitigate the risk of staff members introducing the virus from the community. At each institution, any additional available vaccines are given to inmates, beginning with those deemed at high risk.

To date, 190,470 vaccine doses have been distributed to the Bureau of Prisons nationwide. Of that amount, 188,661 have been administered. *See* COVID-19 Vaccine Implementation, *available at* https://www.bop.gov/coronavirus/# (last accessed on June 7, 2021). According to the BOP, Fort Dix received its first allotment of the COVID-19 vaccine in or around late December 2020. To date, 247 staff members and 1,485 inmates at Fort Dix FCI have received the vaccine. *See id.*

---

https://nij.ojp.gov/sites/g/files/xyckuh171/files/media/document/the-first-step-act-of-2018-risk-and-needs-assessment-system-updated.pdf.

3.    *COVID-19 Impacts*

Unfortunately and inevitably, some facilities have been harder hit by the virus than others, and some inmates have become ill, as Williams has.  As of June 2, 2021, FCI Fort Dix has no positive inmates, no positive staff members, and two inmate deaths, with 1,767 inmates and 93 staff members having been infected but recovered.[6]

Further, BOP has other critical considerations that must be considered, which are separate and apart from its concern for the health of its inmates. For example, notwithstanding the current pandemic, BOP must carry out its charge to incarcerate sentenced criminals to protect the public, provide effective deterrence, and effectuate the other penological considerations set forth in 18 U.S.C. § 3553(a). It must consider the effect of a mass release on the safety and health of both the inmate population and the citizenry.  It must marshal its resources to care for inmates in the most efficient and beneficial manner possible. It must assess release plans, which are essential to ensure that a defendant has a safe place to live and access to health care in these difficult times. And it must consider myriad other factors, including the availability of both transportation for inmates (at a time that interstate transportation services often used by released inmates are providing reduced service) and supervision of inmates once released (at a time that the Probation Office has necessarily cut back on home visits and supervision).

## II.    **LEGAL FRAMEWORK**

Under 18 U.S.C. § 3582(c)(1)(A), this Court may, in certain circumstances, grant a defendant's motion to reduce his term of imprisonment.

### A.    **Inmates must exhaust their administrative remedies.**

Before seeking judicial intervention, a defendant must first request that BOP file such a motion on his behalf.  18 U.S.C. § 3582(c)(1)(A).  A court may grant a defendant's motion for a reduction in his sentence only if the motion was filed "after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf" or after 30 days have passed "from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."  *Id.*

---

[6] *See COVID-19 Cases*, BOP, *available at* https://www.bop.gov/coronavirus/ (last accessed on June 7, 2021).

**B.      The Defendant has the burden to show that he is entitled to relief.**

If an inmate exhausts his rights, the Court may reduce a defendant's term of imprisonment "after considering the factors set forth in [18 U.S.C. § 3553(a)]," if the Court finds, as relevant here, that: (i) "extraordinary and compelling reasons warrant such a reduction"; and (ii) "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission."  18 U.S.C. § 3582(c)(1)(A)(i).  As the movant, Williams bears the burden to establish that he is eligible for a sentence reduction.  *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016); *United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014); *United States v. Epstein*, Crim. No. 14-287 (FLW), 2020 WL 1808616, at *2 (D.N.J. Apr. 9, 2020).

The relevant policy statement provides that a court may reduce the term of imprisonment after considering the Section 3553(a) factors if the Court finds that:  (i) "extraordinary and compelling reasons warrant the reduction"; (ii) "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)"; and (iii) "the reduction is consistent with this policy statement."  U.S.S.G. § 1B1.13.

The policy statement includes an Application Note that specifies the types of medical conditions that qualify as "extraordinary and compelling reasons."  First, the standard is met if a defendant is "suffering from a terminal illness," such as "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, [or] advanced dementia."  Application Note 1(A)(i) to U.S.S.G. § 1B1.13.  Second, the standard is met if the defendant is:

(I)      suffering from a serious physical or medical condition,

(II)     suffering from a serious functional or cognitive impairment, or

(III)    experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility *and from which he is not expected to recover.*

Application Note 1(A)(ii) to U.S.S.G. § 1B1.13 (emphasis added).  The Application Note also sets out other conditions and characteristics that qualify as "extraordinary and compelling reasons" related to the defendant's age and family circumstances.  Application Note 1(B)-(C) to U.S.S.G. § 1B1.13.  Finally, the Note recognizes the possibility that BOP could identify other grounds that

amount to "extraordinary and compelling reasons."  Application Note 1(D) to
U.S.S.G. § 1B1.13.

The sentencing inquiry does not end there.  The Court must also
consider the § 3553(a) factors as part of its analysis and weigh whether, even if
the defendant has set forth extraordinary and compelling reasons,
compassionate release is justified.  *See* § 3582(c)(1)(A); *United States v.
Chambliss*, 948 F.3d 691, 694 (5th Cir. 2020).

## III.   ARGUMENT

### A.   Williams has exhausted his administrative remedies.

Williams appears to have exhausted his administrative remedies.
Because Williams has exhausted his administrative remedies, the Court should
consider the merits of his motion.

### B.   Williams does not present any extraordinary and compelling reasons for release.

Williams has not presented any extraordinary and compelling reasons for
his release.  As explained above, under the relevant provision of § 3582(c), a
court can grant a sentence reduction only if it determines that "extraordinary
and compelling reasons" justify the reduction and that "such a reduction is
consistent with applicable policy statements issued by the Sentencing
Commission."  18 U.S.C. § 3582(c)(1)(A)(i).  The Sentencing Commission's policy
statement defines "extraordinary and compelling reasons" to include, as
relevant here, certain specified categories of medical conditions.  U.S.S.G. §
1B1.13, cmt. n.1(A).

For that reason, to state a cognizable basis for a sentence reduction
based on a medical condition, a defendant first must establish that her or his
condition falls within one of the categories listed in the policy statement. Those
categories include, as particularly relevant here, (i) any terminal illness, and (ii)
any "serious physical or medical condition . . . that substantially diminishes
the ability of the defendant to provide self-care within the environment of a
correctional facility and from which he or she is not expected to recover."
U.S.S.G. 1B1.13, cmt. n.1(A).  If a defendant's medical condition does not fall
within one of the categories specified in the application note (and no other part
of the application note applies), his or her motion must be denied.[7]

---

[7] The mere existence of the COVID-19 pandemic, which poses a general threat to every
non-immune person in the country, does not fall into either of those categories and
therefore could not alone provide a basis for a sentence reduction.  The categories
encompass specific, serious medical conditions afflicting an individual inmate, not

That does not mean, however, that COVID-19 is irrelevant to a court's analysis of a motion under § 3582(c)(1)(A).  If an inmate has a chronic medical condition that has been identified by the CDC as elevating the inmate's risk of becoming seriously ill from COVID-19, that condition may satisfy the standard of "extraordinary and compelling reasons."  Under these circumstances, a chronic condition (i.e., one "from which [the defendant] is not expected to recover") reasonably may be found to be "serious" and to "substantially diminish[] the ability of the defendant to provide self-care within the environment of a correctional facility," even if that condition would not have constituted an "extraordinary and compelling reason" absent the risk of COVID-19.  U.S.S.G. § 1B1.13, cmt. n.1(A)(ii)(I).

The policy statement also includes a catchall provision for "Other Reasons," which provides: "As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in" the other subdivisions of the comment to the policy statement.  *Id.*, cmt. n.1(D).

>    **i.    Williams' obesity and other medical conditions do not constitute the type of extraordinary and compelling reasons necessary for relief**

Here, Williams lists myriad of medical conditions which he claims make him more at risk for contracting a severe form of COVID-19, including obesity[8],

---

generalized threats to the entire population. As the Third Circuit has held, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *Raia*, 954 F.3d at 597; *see also United States v. Eberhart*, Crim. No. 13-313, 2020 WL 1450745, at *2 (N.D. Cal. March 25, 2020) ("[A] reduction of sentence due solely to concerns about the spread of COVID-19 is not consistent with the applicable policy statement of the Sentencing Commission as required by § 3582(c)(1)(A).").  Section 3582(c)(1)(A) contemplates sentence reductions for specific individuals, not the widespread prophylactic release of inmates and the modification of lawfully imposed sentences to deal with a worldwide viral pandemic.

[8] Williams claims that his BMI is a 35, but his medical records list it at a 32.4 (Gov't Ex. A at 50).

history of smoking marijuana[9], hyperlipidemia[10], bronchitis, low blood pressure, chronic knee pain, and a massive ear infection.  *See* December 23, 2020 Motion at 5.  Of this list, only obesity is a listed condition that the CDC believes could make someone more at risk for contracting a severe form of COVID-19.  See https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited June 2, 2021).  Accordingly, the Government will focus on Williams' obesity claim.  His medical records indicate that his BMI is 32.4, which is considered obese under current CDC guidelines. Gov't Ex. A at 50.

While Williams' obesity, could establish an "extraordinary and compelling reason" within the meaning of § 3582(c)(1)(A) and the Sentencing Commission's policy statement, his health appears to be monitored and managed adequately at Fort Dix FCI.  While the Government concedes that Williams, who is 43 years old, has a co-morbidity factor based on his obesity, he is receiving adequate medical care, and his obesity is managed effectively at Fort Dix.  According to records from Fort Dix FCI, the defendant currently weighs 204 pounds and is 5'1.  Gov't Ex. A at 48.  BMI is a measure of an individual's body fat calculated from height and weight.[11]  Based on the BMI calculator, his BMI is 32.4.  The CDC's threshold for increased risk of severe illness from COVID-19 is 30—anyone with a BMI over 30 is therefore medically obese.

First, Williams medical records indicate that his condition is adequately managed, and that his condition does not present any impediment to his ability to provide self-care within Fort Dix FCI.  Throughout his time at Fort Dix, Williams has continuously received adequate care addressing his obesity.

---

[9] Unsurprisingly, the CDC does not provide guidance regarding exposure to marijuana smoke, but does focus on cigarette smoking.  Even assuming that smoking marijuana has the same harmful effects as tobacco smoking, that argument also fails.  Indeed, other courts have not been compelled by a history of smoking cigarettes as a reason for compassionate release.  *See United States v. Carlos Jackson*, Crim. No. 5-20018-01 (JWL), 2020 WL 5231317 (D. Kan. Sept. 2, 2020) (finding history of smoking not compelling reasons for compassionate release); *United States v. Andrew Stafford*, Crim. No. 16-336, 2020 WL 3893401, at *2 (JKB) (D. Md. July 10, 2020) (based on his age (60) and history of smoking defendant is not sufficiently differentiated by thousands of similarly situated incarnated inmates); *United States v. Leigh-James*, Crim. No. 15-188 (SRU), 2020 WL 4003566, at *8 (D. Conn. July 15, 2020) (denying motion for compassionate release filed by African-American man with history of smoking in absence of particularized impact on health); *United States v. Marsh*, Crim. No. 14-83, 2020 WL 3989580, at *2 (D. Vt. July 15, 2020) (denying motion for compassionate release despite history of smoking where there was no showing of related disease).
[10] Hyperlipidemia is a condition that incorporates various genetic and acquired disorders that describe elevated lipid levels within the human body.
[11] *See* BMI Calculator, *available at* https://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmicalc.htm.

Gov't Ex. A at 48, 51, 84. Thus, Fort Dix FCI's medical staff is demonstrably well-equipped to continue to care for Williams' underlying health conditions, and Williams has failed to meet his "burden of showing that he has received – or will receive, if he requests it – inadequate medical care at [the prison]." *See United States v. Viteri,* Crim. No. 19-44, 2020 WL 3396804, at *5 (DNJ June 19, 2020) (J. Wolfson).

Courts in this district and around the country have denied compassionate release, and other similar requests for relief, in circumstances similar or more precarious (i.e., much higher BMI's) than Williams', including where the inmate is obese or has a medical condition that the CDC continues to recognize increase the risk of severe illness from COVID-19. *See, e.g.*, *United States v. Tiller*, Crim. No. 14-699-06 (D.N.J. Sept. 28, 2020) (J. Bumb) (denying defendant's motion for compassionate release from FCI Allenwood Low despite the defendant being obese with a BMI of 36.1 and high blood pressure, especially where the facility did not have any active cases and the sentencing factors weighed against release); *United States v. Jefferson*, Crim. No. 18-165 (D.N.J. Sept. 14, 2020) (J. Chesler) (denying motion for compassionate release from FCI Allenwood Medium despite severe health conditions, including obesity, hypertension, sleep apnea and cryptococcal meningitis and a recent surgery for a vascular condition, because Allenwood Medium was not an unsafe environment given the BOP's effective measures there to reduce the impact of the pandemic, the sentencing factors weighed against release, and the defendant still had to serve 12 years of his 17-year sentence); *United States v. Cooper*, Crim. No. 17-106 (D.N.J. Aug. 25, 2020) (J. Arleo) (denying motion for release where the defendant's obesity and hypertension were controlled, there was no indication that the defendant was exposed to the virus, and the defendant had committed the violent offense of Hobbs Act robbery); *United States v. Santiago*, Crim. No. 15-324, D.E. 73 (D.N.J. Aug. 6, 2020) (J. Hayden) (denying release where defendant had a long history of narcotics and firearms offenses, and defendant was receiving adequate treatment for asthma and BMI of 32 was not a significant risk where weightlifting contributed to increased BMI); *United States v. Lattanzio*, Crim. No. 15-446 (D.N.J. June 17, 2020) (J. McNulty) (defendant – age 63 with a BMI of 34.43 and a history of heart disease – was not entitled to compassionate release where he had already contracted COVID-19 and the need for punishment and deterrence was paramount, especially when he had only served 28% of his 72-month sentence imposed after the defendant was convicted at trial); *United States v. Terry*, Crim. No. 16-210, 2020 WL 3264086 (D.N.J. June 17, 2020) (J. McNulty) (despite the defendant's Type II diabetes and hypertension, his motion for compassionate release denied because: as long as defendant cooperates, BOP could manage the defendant's medical conditions; there was a low-to nonexistent infection rate at Allenwood, and the measures taken by BOP to minimize and contain infections, the circumstances are not so extraordinary and compelling as to support compassionate release; and the 3353(a) factors required the defendant

- 12 -

to continue serving his sentence); *United States v. Durante*, Crim. No. 11-277, 2020 WL 2520280 (D.N.J. May 18, 2020) (J. Chesler) (hypertensive 61-year old defendant's compassionate release motion denied for failing to demonstrate extraordinary and compelling reasons, the 3553(a) factors weighed against release based on seriousness of offense, and the court had already substantially varied down from the guidelines range at sentencing);[12] *see also, United States v. Medellin*, Crim. No. 15-72, 2020 WL 4048139, at *1 (N.D. Ind. July 20, 2020) (denying 33-year-old's motion for reconsideration of compassionate release denial; defendant had hypertension and obesity); *United States v. Scott*, Crim. No. 16-0429, 2020 WL 4041161, at *2 (D. Md. July 17, 2020) ("relatively young" defendant convicted of conspiracy to distribute cocaine base with high blood pressure, borderline diabetes, obesity, and sleep apnea denied relief); *United States v. Moore*, Crim. No. 11-00082, 2020 WL 4041110, at *1 (D. Nev. July 17, 2020), at *1 (denying compassionate release for defendant convicted of cocaine base distribution who suffered from morbid obesity, hyperlipidemia, chronic kidney disease, and hypertension); *United States v. Jones*, Crim. No. 18-137, 2020 WL 3969912, at *4 (N.D. Ind. July 14, 2020) (denying compassionate release despite defendant's Type 2 diabetes, hypertension, and obesity); *United States v. Collins*, Crim. No. 14-30038, 2020 WL 2301217, at *1-2 (C.D. Ill. May 8, 2020) (denying § 3582 motion filed by a 61-year-old defendant diagnosed with asthma, high blood pressure, and coronary artery disease, noting that "the COVID-19 pandemic does not warrant the release of every federal prisoner with health conditions that makes him more susceptible to the disease."

In sum, Williams' medical condition does not substantially diminish his ability to provide self-care in the prison environment. He fails to demonstrate that BOP is incapable of protecting his health or that he is receiving inadequate medical treatment. The motion should be denied.

---

[12] Recently, this district granted a motion for compassionate release for a defendant with diabetes and obesity. Significantly, unlike Lucas-Ramos, the BOP had recommended that the defendant be released from FCI Allenwood Low to a halfway house approximately one month later and was morbidly obese with a **BMI of 51**. *See United States v. Stango*, Crim. No. 15-408 (D.N.J. Oct. 14, 2020) (J. Arleo) (motion for compassionate release granted because defendant was severely obese and only had one more month of confinement prior to release to a halfway house); *see also United States v. Rodriguez*, Crim. No. 14-346 (RMB) (Sept. 22, 2020) (motion for release granted and defendant placed on location monitoring where defendant was obese and suffered from Type-II diabetes because the defendant was nearing the end of his 10-year sentence and was scheduled to be released to a halfway house in November 2020).

ii.  **Williams' speculative concern for reinfection is not an extraordinary and compelling reasons necessary for relief**

Williams' main argument for compassionate release is based on his fear of reinfection and contracting a severe form of COVID-19.[13] This argument is speculative and thus is not an extraordinary and compelling circumstance justifying release.  Moreover, Williams' prior COVID-19 infection cuts against compassionate release because, while reinfection rates are not entirely understood, the CDC has stated that "cases of reinfection with COVID-19 have been reported, *but remain rare*."  CDC, Reinfection with COVID-19, available at https://www.cdc.gov/coronavirus/2019-ncov/your-health/reinfection.html (last accessed on June 2, 2021) (emphasis added).  Courts around the country have routinely denied compassionate release requests from inmates who have previously tested positive for COVID-19 because the risk of reinfection is entirely hypothetical.[14]

Finally, Williams was *twice* offered the Moderna COVID-19 vaccine in December 2020 and March 2021, but he declined it both times.  This fact alone would likely doom Williams' motion for compassionate release because, vaccination would significantly (if not entirely) reduce his chances of becoming significantly ill if reinfected by COVID-19.  In his defense, in his April 2021,

---

[13] Williams also claims that the need to see his family is also a compelling reason. However, this is not a compelling and extraordinary reason for compassionate release.
[14] *See United States v. McCallum*, 2020 WL 7647198, at *1 (S.D.N.Y. Dec. 23, 2020) ("Now that he has weathered the disease, a sentence reduction based on the risk of contracting it no longer makes sense."); *United States v. Moore*, 2020 WL 7264597, at *3 (E.D. Pa. Dec. 10, 2020) (inmate suffers from mild obesity and hypertension; release is denied because he recovered from COVID-19 without symptoms); *United States v. Eddings*, 2020 WL 2615029 (E.D. Cal. May 22, 2020) (Inmate has risk factors, but he has endured COVID-19 for ten days without complications, so there is no extraordinary circumstance); *United States v. Zahn*, 2020 WL 3035795, at *2 (N.D. Cal. June 6, 2020) ("[T]he immediate threat [of COVID-19 infection] to Zahn has passed, fortunately with no serious complications of any kind. That is enough to find that he has not proffered an extraordinary and compelling reason for release."); *United States v. Billings*, 2020 WL 4705285, at *5 (D. Colo. Aug. 13, 2020) ("At this point, however, the possibility of reinfection, if not impossible, is strictly hypothetical. That uncertainty militates against an entitlement to compassionate release. . . . Indeed, in other cases where inmates have recovered from COVID without lingering symptoms, courts have found the theoretical risk of reinfection does not present a compelling reason warranting compassionate release.") (citing cases); *United States v. Purry*, 2020 WL 5909793, at *2 (D. Nev. Oct. 6, 2020) ("[A] possibility [of reinfection] that is unconfirmed by science is insufficient to create an extraordinary and compelling circumstance justifying his release.").

letter he explained that he declined the vaccine because he had an ear infection and continued to have residual symptoms from his previous COVID-19 infection. *See* April 5, 2021 letter at 3. However, Williams does not offer an explanation for why he declined the vaccine in December 2020. Moreover, on the form in which he declined that offer he did not answer yes to any of the questions that would indicate he was currently sick at the time he declined the vaccine. *See* Gov't Ex. A at 92.

Courts around the country have routinely denied motions for compassionate release to inmates who have refused vaccines—even those who in fact suffer from multiple serious medical conditions.[15]

---

[15] *See, e.g., United States v. Greenlaw*, 2021 WL 1277958, at *7 (D. Me. Apr. 6, 2021) (reviewing CDC guidance and numerous other decisions and concluding that "The risk-benefit analysis in favor of inoculation is so overwhelming that the Court holds Mr. Greenlaw's refusal to be vaccinated against his motion for compassionate release."); *United States v. Baeza-Vargas*, 2021 WL 1250349, at *2-3 (D. Ariz. Apr. 5, 2021) ("Judges of this Court, as well as others around the country, have ruled with consistency that an inmate's denial of a COVID-19 vaccination weighs against a finding of extraordinary and compelling circumstances.") (citing more than a dozen cases); *United States v. Jackson*, 2021 WL 1145903 at *2 (E.D. Pa. Mar. 25, 2021); *United States v. Austin*, 2021 WL 1137987, *2 (E.D. Mich. Mar. 25, 2021); *United States v. Jackson*, 2021 WL 806366, at *1-2 (D. Minn. Mar. 3, 2021) ("Jackson's decision to refuse the vaccine flies in the face of any medical recommendation regarding the vaccines. While he is within his rights to refuse any treatment he wishes to forego, he cannot simultaneously claim that he must be released because of the risk of complications while refusing a vaccine that could virtually eliminate that risk."); *United States v. Lohmeier*, 2021 WL 365773, at *2 (N.D. Ill. Feb. 3, 2021) ("In declining vaccination (twice), Mr. Lohmeier declined the opportunity to reduce his risk exposure to COVID-19 dramatically; he cannot reasonably expect that prolonging his risk by declining vaccination will be rewarded with a sentence reduction."); *United States v. Williams*, 2021 WL 321904 at *3 (D. Ariz. Feb. 1, 2021) (defendant's explanation for refusal was "incredible in light of his claim that his risk of a serious illness from the COVID-19 virus is an extraordinary and compelling reason for his immediate release"); *United States v. Gonzalez Zambrano*, 2021 WL 248592 at *5 (N.D. Iowa Jan. 25, 2021) (denying based on 3553(a) factors, but noting: "It would be paradoxical to a system whereby a defendant could [proffer] extraordinary and compelling circumstances for compassionate release" by refusing "health care [offered] to them"); *United States v. French*, 2021 WL 1316706, at *6 (M.D. Tenn. Apr. 8, 2021) (relief denied in part based on refusal of vaccine); *United States v. Pruitt*, 2021 WL 1222155, at *3 (N.D. Tex. Apr. 1, 2021); *United States v. Piles*, 2021 WL 1198019, at *3 (D.D.C. Mar. 30, 2021); *United States v. Toney*, 2021 WL 1175410, at *1 (E.D. Mich. Mar. 29, 2021); *United States v. Figueroa*, 2021 WL 1122590, at *5 (E.D. Cal. Mar. 24, 2021) ("If defendants could buttress their motions for compassionate release by refusing a safe and effective vaccine, they would be operating on an unfairly perverse incentive."); *United States v. Reynoso*, 2021 WL 950081, at *2 (D. Mass. Mar. 12, 2021) ("[T]he sincerity of his concern for his health is dubious given that he rejected the opportunity to receive the COVID-19 vaccine"); *United States v. Mascuzzio*, 2021 WL 794504, at *3 (S.D.N.Y. Mar. 2, 2021); *United States v. Martinez*, 2021 WL 718208, at

Williams' refusal to be vaccinated therefore completely undermines his assertion that he has established extraordinary and compelling reasons warranting release.  For the foregoing reasons, Williams has not established extraordinary or compelling circumstances justifying compassionate release.

### C.    The § 3553(a) factors also warrant continued confinement.

Even if Williams had presented extraordinary and compelling reasons warranting release (which he has not), he still would not be entitled to relief because the § 3553(a) factors strongly militate in favor of continued incarceration.  A § 3553(a) analysis reflects that Williams is not an appropriate candidate for a reduction of his sentence.

Indeed, the nature and circumstances of Williams' offense here—and his dangerous actions surrounding it—are very serious and warrant him completing his sentence.  Simply put, Williams was involved in a significant controlled substance conspiracy in which the conspirators would routinely obtain large shipments of controlled substances from California for distribution in New Jersey.  He was prosecuted for his role in a 141 kilogram shipment of cocaine and heroin, but the investigation showed that he was likely receiving monthly shipments of significant quantities of controlled substances.  The seriousness of the Defendant's offense is further exacerbated by the fact that New Jersey is in the grips of a heroin crisis.[16]  Indeed, statistics from the CDC around the time of his arrest reveal that approximately 70,000 people died from a drug overdose, meaning about 193 people a day died from drug overdoses.[17]  Meaning that by his actions, he was contributing to this deadly epidemic right here on the streets of New Jersey.

Moreover, when law enforcement went to arrest him, he engaged in inexcusable and dangerous behavior, including ramming his car into a car occupied by two law enforcement officers.  He then fled away at high rates of speeds endangering innocent bystanders.  In fact, law enforcement did not

---

*2 (D. Ariz. Feb. 24, 2021); *United States v. King*, 2021 WL 736422, at *2 (S.D.N.Y. Feb. 24, 2021); *United States v. McBride*, 2021 WL 354129, at *3 (W.D.N.C. Feb. 2, 2021).

[16] *See, e.g.,* "Herointown, N.J.: The state's heroin crisis in 9 startling statistics," NJ.com, (Dec. 15, 2015); Task Force on Heroin & Other Opiate Use by New Jersey's Youth and Young Adults, 2014 Report Confronting New Jersey's New Drug Problem 5, available at http://gcada.nj.gov/policy/master/documents/2014_TaskForce_Report.pdf (this report by a statewide task force, appointed by the Governor of New Jersey, states, "[t]he skyrocketing use of heroin and other opiates has become the number one health care crisis confronting New Jersey").

[17] https://www.drugabuse.gov/related-topics/trends-statistics/overdose-death-rates.

pursue him because of the danger is presented to both them and innocent bystanders.

Williams' sentence was thus necessary and appropriate to adequately address the seriousness of his offenses.  And, in fact, by sentencing Williams to 121 months' imprisonment, Your Honor already recognized the seriousness of this conduct.  In sum, releasing Williams prematurely would not promote the interests of sentencing that are set forth in § 3553(a).

### D.    The Court Cannot Direct the BOP to Place Williams on Home Confinement.

Finally, to the extent Williams is requesting this Court to order BOP to place him on home confinement under the guidelines set forth in the Attorney General's March 26 and April 3, 2020 memoranda, this Court should deny the request.  As this Court is aware, district courts have no authority to direct BOP to place a defendant in home confinement.  *United States v. Voda*, 994 F.2d 149, 151-52 (5th Cir. 1993).  Rather, such designation decisions are committed solely to BOP's discretion.  *See* 18 U.S.C. § 3621(b); *Moore v. United States Att'y Gen.*, 473 F.2d 1375, 1376 (5th Cir. 1973) (per curiam); *see also McKune v. Lile*, 536 U.S. 24, 39 (2002) (plurality opinion) ("It is well settled that the decision where to house inmates is at the core of prison administrators' expertise.").

Moreover, a prisoner has no constitutional right to confinement in any particular place, including in home confinement.  *See Sandin v. Conner*, 515 U.S. 472, 478 (1995) ("The Due Process Clause did not itself create a liberty interest in prisoners to be free from intrastate prison transfers."); *Meachum v. Fano*, 427 U.S. 215, 224 (1976) ("The conviction has sufficiently extinguished the defendant's liberty interest to empower the State to confine him in *any* of its prisons.").  And Section 3582(c)(1)(A) permits only a reduction in "the term of imprisonment," not a change in the place of imprisonment.  Home confinement merely permits the inmate to serve out the term of imprisonment at home.  Such a request therefore falls outside § 3582(c)'s limited grant of authority to this Court to modify a sentence post-conviction.  Absent any other statutory authority, this Court has no authority to grant such relief in this forum.

## IV.    Conclusion

Williams has failed to meet his burden of showing that compassionate release is warranted in this case.  In sum, he has not shown that a medical condition presents extraordinary and compelling circumstances.  Moreover, the § 3553(a) factors weigh against granting him the relief he seeks here. Accordingly, Williams' motion for immediate release should be denied, and he

should serve the entirety of his sentence of imprisonment, as calculated by BOP.[18]

Respectfully submitted,

RACHAEL A. HONIG
Acting United States Attorney

By:   _____/s *Meredith Williams*_____
Meredith Williams
Assistant U.S. Attorney

cc:   Siddeeq Williams, *pro se* (Mailed to Fort Dix)

---

[18] If the Court is, however inclined to grant compassionate release, the Government respectfully asks that this Court require Williams to serve a two-week quarantine at his facility, if BOP can reasonably do so, and to require BOP to administer a COVID-19 test to confirm that Williams is not currently positive when he is released.  Lastly, if the Court grants Williams' request, the Government further requests that the Court structure any release order to require an appropriate release plan to ensure that Williams' has somewhere to live and that he will be supervised by a probation officer in the district where he will reside.